This decision was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

   Plaintiff-Appellee,

**v.**                                                          **NO. 32,527**

**JESSE FREEMAN,**

   Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Don Maddox, District Judge**

Jacqueline L. Cooper, Chief Appellate Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

## DECISION

**DANIELS, Justice.**

{1} A jury convicted Defendant of first-degree murder and tampering with evidence after he shot an acquaintance twice in the head and hid the weapon he used. The district court sentenced Defendant to life in prison for the first-degree murder, giving this Court exclusive jurisdiction to hear his direct appeal. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."); *accord* Rule 12-102(A)(1) NMRA.

{2} Defendant argues that (1) admission of a pathologist's testimony related to the victim's autopsy violated Defendant's right to confront the witnesses against him, (2) the jury should have received an instruction on self-defense, (3) Defendant's trial counsel was ineffective because counsel did not request a self-defense instruction, and (4) the evidence at trial was insufficient to support Defendant's convictions.

{3} We find no error. Because the claims raise no questions of law that New Mexico precedent does not already address sufficiently, we issue this unpublished decision affirming Defendant's convictions pursuant to Rule 12-405(B)(1) NMRA.

## I. BACKGROUND

### A. Testimony at Trial

{4} Defendant and Robert Fleetwood argued over money on the morning of April

20, 2009. Defendant went to Mr. Fleetwood's house and fatally shot him the next morning at around 4:00 a.m.

{5} Defendant had lived with the victim from time to time and also dated Sarah Dunn, the victim's goddaughter. Sarah testified at trial and received use immunity for her testimony. Sarah told the jury that she went to bed at about 11:00 p.m. the night before the killing and explained that Defendant was with her and was still awake when she went to sleep. Defendant was asleep when Sarah awoke the next morning. While Defendant and Sarah were out running errands later that morning, Defendant used the victim's ATM card to take money out of the victim's bank account. Defendant and Sarah buried a pistol in a prairie dog hole near the outskirts of town later in the day.

{6} Sarah testified that, after burying the pistol, she went to Walmart with Defendant and others and then to a convenience store where Defendant threw a bag containing his old shoes into the trash. In the early evening, Sarah, Defendant, and Sarah's father went to the victim's house to bring him some things and found the victim dead. The house had been "trashed" since Sarah had last seen it. Sarah's father called the police.

{7} When they arrived, the police entered the house and found the victim lying on the couch with his back toward the door. The victim was dead—apparently killed by

3

two gunshots to the head. The police noted that the pattern of blood flow from the wounds suggested the victim had neither moved nor been moved after the shooting, leading police to conclude that the victim was shot while lying on the couch.

{8}     Sarah told the jury that a couple of days after the killing, Defendant admitted to her that he killed the victim. He told her that he went to the victim's house at about four in the morning and shot the sleeping victim twice in the head from behind the couch. Defendant told her that the pistol that they buried earlier in the week was the pistol he used to kill the victim. Sarah knew that the pistol they buried was the victim's pistol and that it was a .22 caliber. Sarah reported the conversation to the police after Defendant admitted that he killed the victim.

**B.     Defendant's Statement to Police**

{9}     At 8:34 p.m. on May 1, 2009, Defendant spoke to State Police investigators shortly after they took Defendant into custody. At trial, the State played the DVD recording of the interview, with minor redactions, for the jury. Defendant did not testify at trial.

{10}     Defendant spent the first ten minutes of the video-taped interview denying having shot the victim. Defendant eventually told investigators that he walked from Sarah's house to the victim's house and arrived at around "three or four" in the

4

morning. He explained that when he came into the living room, he found the victim lying on the couch with his back toward the door. Defendant said the victim rolled over, cocked a pistol, and fired at him. Defendant said that he took the pistol from the victim, shot him in response, and then shot him a second time because the victim was "gurgling" and because Defendant did not want the victim to suffer. Defendant explained that he shot the victim because the victim had once told him that if Defendant "ever shot him or anything," Defendant should make sure he was dead. Defendant said he believed the victim must have wanted to die because Defendant previously told the victim that if the victim ever shot at him, Defendant would kill him. Defendant indicated he "was about that far away" with the pistol when he shot the victim, and demonstrated with his fingers a distance that appears on the video to be about four inches.

{11} Defendant explained that while this was not the first time the victim had "pulled a gun on [him]," this was the first time the victim had ever shot at Defendant. Defendant explained that he expected the police could find a bullet hole "at the top of the window" near "where [the victim] fired that gun."

{12} Defendant explained that after the shooting, Defendant looked around the house for hydrocodone pain pills he had left at the victim's house earlier. Defendant also

5

removed shells from the pistol and threw them away.

{13} Defendant described getting rid of the pistol the next day by burying it in a prairie dog hole in an open field. Defendant also said he took off the clothes he had been wearing the night before and threw them into a garbage dumpster.

{14} When the interview concluded that night, Defendant went out to the field with the police to help them find the pistol, although they did not find it at that time. Later when the police took Sarah out to the field, they found the pistol after Sarah showed the officers which holes to search.

{15} The jury returned guilty verdicts on both counts, and the court ordered consecutive sentences of life in prison for first-degree murder and three years plus a one-year habitual offender enhancement for tampering with evidence. This direct appeal followed.

**II.    DISCUSSION**

**A.    Defendant's Right to Confrontation Was Not Violated.**

{16} Defendant claims his right to confrontation was violated because, while the supervising pathologist testified at trial, a pathology fellow who performed much of the autopsy did not.

**1.    *Standard of Review***

6

{17} "'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .'" *State v. Zamarripa*, 2009-NMSC-001, ¶ 23, 145 N.M. 402, 199 P.3d 846 (quoting U.S. Const. amend. VI). "Out-of-court testimonial statements are barred under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." *Id.* ¶ 23 (citing *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004)). Whether evidence was admitted in violation of the Confrontation Clause is a question of law which this Court reviews de novo. *See State v. Aragon*, 2010-NMSC-008, ¶ 6, 147 N.M. 474, 225 P.3d 1280, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 & note 6, __ N.M. __, __ P.3d __.

{18} Because Defendant never objected to the admission of the pathologist's statements at trial, we review the statements to determine whether their admission created fundamental error. *See State v. Cunningham*, 2000-NMSC-009, ¶ 8, 128 N.M. 711, 998 P.2d 176; *see also State v. Martinez*, 2007-NMSC-025, ¶ 25, 141 N.M. 713, 160 P.3d 894 (reviewing a defendant's unpreserved Confrontation Clause claim for fundamental error). We reverse a conviction for fundamental error "only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been

7

done." *State v. Orosco*, 113 N.M. 780, 784, 833 P.2d 1146, 1150 (1992).

**2.      *The Pathologist's Testimony***

{19}      Dr. Ross Reichard of the Office of the Medical Investigator in Albuquerque was the supervising pathologist for the victim's autopsy.  He explained at trial that, in typical autopsies, the supervising pathologist participates in the autopsy by overseeing the pathology fellow, maintaining a presence during the key components of the autopsy, and exploring the key pathologies.  The criminal investigator explained to the jury that while a pathology fellow performed much of the autopsy in this case, the supervising pathologist also participated and "constantly" came back to look at portions of the victim's autopsy, discuss observations with the pathology fellow, and explain to the pathology fellow and the investigator the significance of the supervisor's observations.

{20}      The supervising pathologist gave the jury his medical opinion—the victim died as a result of gunshot wounds to the head.  He based this opinion on his own observations, including the fact that the victim had two gunshot wounds to the head.  Both entrance wounds were close together on the left temple.  The pathologist explained that the entrance and exit wounds defined bullet trajectories from the left to the right side of the victim's head, angled very slightly front-to-back and downward

8

but primarily left-to-right. The pathologist saw surrounding damage to the skin including soot deposits on the skin around both entrance wounds. He explained that gunshot residue "travels short distances" and likely caused the "stippling" he saw on the victim's skin. The pathologist indicated the evidence suggested a "near-contact type gunshot wound" and told the jury that each injury was consistent with a single bullet. The pathologist also noted a small laceration on the victim's right thumb, and postulated that it was caused by "something" that came out of an exit wound when the victim was shot.

### 3. *No Out-of-Court Statements Were Introduced.*

{21} Defendant argues that the "results" of the autopsy were inadmissible because another pathologist, who worked with the supervising pathologist on the autopsy, did not testify. But this argument confuses an out-of-court statement (the autopsy report) with an in-court statement (the testimony of the supervising pathologist) that happens to include the same facts as the out-of-court statement. All of the out-of-state cases Defendant cites in support of this argument are unpersuasive because they refer to autopsy reports, not autopsy "results." And Defendant cites no authority that supports the proposition that a witness may not testify to things the witness personally observed simply because those things were also recorded in a potentially inadmissible

9

document. *See Lee v. Lee (In re Doe)*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) (explaining that where a brief provides no authority to support a position, we may assume no such authority exists).

{22} No autopsy report was ever admitted into evidence. The only medical opinions or conclusions entered into evidence were those of the supervising pathologist, who testified about what *he* observed and what *he* concluded from those observations. This testimony was in-court and subject to cross-examination. Thus, no "[o]ut-of-court testimonial statements" are at issue because no out-of-court statements were introduced into evidence. Because the Confrontation Clause bars only out-of-court testimonial statements, we hold that Defendant's confrontation right was not violated.

**B.      Defendant Was Not Entitled to a Self-Defense Instruction.**

{23} Defendant's closing argument makes it clear that his theory of the case was self-defense. But he never requested a self-defense instruction. Defendant now claims that it was fundamental error for the district court to fail to instruct the jury on self-defense.

**1.      *Standard of Review***

{24} The propriety of jury instructions given or denied is a mixed question of law and fact that we review de novo. *See State v. Salazar*, 1997-NMSC-044, ¶ 49, 123

10

N.M. 778, 945 P.2d 996. Our review depends upon whether the issue has been preserved. *See State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. If the issue has been preserved, this Court reviews the instruction for reversible error. *Id.* If the issue has not been preserved, this Court reviews for fundamental error. *Id.* Because Defendant did not preserve this issue at trial, we review his claim for fundamental error. Under fundamental error review, however, the jury verdict will not be reversed unless reversal is necessary to prevent a "miscarriage of justice." *State v. Silva*, 2008-NMSC-051, ¶ 13, 144 N.M. 815, 192 P.3d 1192 (internal quotation marks and citation omitted).

**2.** *There Was Insufficient Evidence to Raise a Reasonable Doubt About Whether Defendant Was Ever in Fear or Killed as a Result of Fear.*

{25} For a self-defense instruction to be warranted, "there need be only enough evidence to raise a reasonable doubt in the mind of a juror about whether the defendant lawfully acted in self-defense. If any reasonable minds could differ, the instruction should be given." *State v. Rudolfo*, 2008-NMSC-036, ¶ 27, 144 N.M. 305, 187 P.3d 170 (internal citation omitted). To warrant the self-defense instruction, the defendant must show sufficient evidence of the three elements of self-defense: "(1) the defendant was put in fear by an apparent danger of immediate death or great

11

bodily harm, (2) the killing resulted from that fear, and (3) the defendant acted reasonably when he or she killed." *Id.* ¶ 17 (internal quotation marks and citation omitted); *see* UJI 14-5171. "The first two requirements, the appearance of immediate danger and actual fear, are subjective in that they focus on the perception of the defendant at the time of the incident." *State v. Coffin*, 1999-NMSC-038, ¶ 15, 128 N.M. 192, 991 P.2d 477. "By contrast, the third requirement is objective in that it focuses on the hypothetical behavior of a reasonable person acting under the same circumstances as the defendant." *Id.*

{26} This Court has held that a defendant who kills after an alleged threat has subsided is not entitled to a self-defense instruction. In *Rudolfo*, the defendant was convicted of first-degree murder after he shot three people who were fleeing in a van. 2008-NMSC-036, ¶¶ 1, 5-6. The evidence suggested that the defendant had been in a fight with one of the two male victims and that a struggle over a rifle broke out. *See id.* ¶ 5. The rifle went off during the struggle, and the two male victims ran away and got into their van. *See id.* ¶¶ 5-6. The defendant, who recovered the rifle, shot at the van, injuring the two men and killing a woman passenger. *See id.* ¶ 6. In rejecting the defendant's argument that the earlier struggle over the gun warranted a self-defense instruction, we said it was clear that "the victims were shot while they were in their

12

van, driving away from [the d]efendant's trailer. If at any point [the d]efendant was put in fear by an appearance of immediate death or great bodily harm, that fear could not have been present when the victims were fleeing in their van." *Id.* ¶ 18. (internal quotation marks and citation omitted). We held that the evidence was insufficient to warrant a self-defense instruction and upheld the defendant's first-degree murder conviction. *See id.* ¶ 27.

{27}     Even if we assumed Defendant's version of the events was true, Defendant would not have been entitled to a self-defense instruction under the principles in *Rudolfo* because there was no evidence that he was in fear when he killed or that he killed as a result of that fear. "The purpose of recognizing self-defense as a complete justification to homicide is the reasonable belief in the necessity for the use of deadly force to repel an attack in order to save oneself or another from death or great bodily harm." *Coffin*, 1999-NMSC-038, ¶ 12. In the video played for the jury at trial, Defendant told the police that he took the gun away from the victim before he killed him. Thus, at the moment Defendant killed the victim, Defendant had already repelled the attack, and no deadly force was necessary. Nothing in Defendant's statement to the police suggests that he was in further danger after he took the gun from the victim. Defendant never told the police that he had been afraid or that he killed as a result of

13

that fear. Instead, he told the police that he killed the victim because the victim shot at him first. This does not warrant a self-defense instruction. *See id.* (explaining that self-defense "does not extend to a defendant's acts of retaliation for another's involvement in a crime against him or her.") This case is like *Rudolfo* because, in both cases, the defendant struggled with another for a gun, after which the defendant killed an unarmed victim who presented no threat to the defendant once the defendant won the struggle. Accordingly, we hold that Defendant did not show sufficient evidence to warrant a self-defense instruction, the district court had no obligation to provide one, and no fundamental error resulted.

**C.      Defendant Received Effective Assistance of Counsel.**

{28}      Defendant claims he was denied his constitutionally guaranteed right to effective assistance of counsel because his attorney never requested a self-defense instruction, even though his theory of the case was clearly self-defense.

**1.      *Standard of Review***

{29}      "Questions of law or questions of mixed fact and law, . . . including the assessment of effective assistance of counsel, are reviewed de novo." *Duncan v. Kerby*, 115 N.M. 344, 347-48, 851 P.2d 466, 469-70 (1993); *see Churchman v. Dorsey*, 1996-NMSC-033, ¶ 11, 122 N.M. 11, 919 P.2d 1076 (reviewing de novo a

claim of ineffective assistance of counsel).

## 2. *Defense Counsel's Failure to Request a Self-Defense Instruction Was Not Error Because Defendant Was Not Entitled to the Instruction.*

{30}     "Under the Sixth Amendment, criminal defendants are entitled to reasonably effective assistance of counsel." *State v. Garcia*, 2011-NMSC-003, ¶ 33, 149 N.M. 185, 246 P.3d 1057 (internal quotation marks and citation omitted). "Ordinarily, a claim of ineffective assistance of counsel has two parts." *Rael v. Blair*, 2007-NMSC-006, ¶ 10, 141 N.M. 232, 153 P.3d 657 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). First, "[a] defendant must show counsel's performance was deficient." *Id.* (internal quotation marks and citation omitted). Second, a defendant must show "that the deficient performance prejudiced the defense." *Id.* (internal quotation marks and citation omitted).

{31}     A defendant bears "the burden of showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different." *State v. Harrison*, 2000-NMSC-022, ¶ 61, 129 N.M. 328, 7 P.3d 478. "If a defendant does not make such a showing, the defendant has not carried his or her burden, and the presumption of effective assistance controls." *Id.* "When an ineffective assistance claim is first raised on direct appeal, we evaluate the facts that

15

are part of the record. *State v. Roybal*, 2002-NMSC-027, ¶ 19, 132 N.M. 657, 54 P.3d 61. If facts necessary to a full determination are not part of the record, an ineffective assistance claim is more properly brought through a habeas corpus petition, although an appellate court may remand a case for an evidentiary hearing if the defendant makes a prima facie case of ineffective assistance." *Id.*

{32}   The facts necessary to fully determine Defendant's claim are part of the record before us. Therefore, we may evaluate Defendant's ineffective assistance claim on this issue in this direct appeal. Because Defendant was not entitled to a self-defense instruction, his counsel's failure to request one cannot be characterized as "deficient performance." Defendant's case was not prejudiced because defense counsel did not request the instruction Defendant was not entitled to. Accordingly, we hold that Defendant was not denied effective assistance of counsel.

**D.   The Evidence Was Sufficient to Support Defendant's Convictions.**

{33}   Defendant argues that the State did not present sufficient evidence to prove that Defendant committed first-degree murder because the State did not present evidence of premeditation and because the State did not prove that the killing was unlawful. Defendant also argues that the State did not present sufficient evidence to prove that he tampered with evidence.

16

**1.**    *Standard of Review*

{34}    "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Riley*, 2010-NMSC-005, ¶ 12, 147 N.M. 557, 226 P.3d 656 (internal quotation marks and citation omitted).  This Court views "the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Cunningham*, 2000-NMSC-009, ¶ 26.  The question before us as a reviewing court is not whether we would have had a reasonable doubt about guilt but whether it would have been impermissibly unreasonable for a jury to have concluded otherwise.  *See Rudolfo*, 2008-NMSC-036, ¶ 29.

**2.**    *Willful and Deliberate Murder*

{35}    In order to find Defendant guilty of first-degree murder, the jury had to find beyond a reasonable doubt that (1) Defendant killed Robert Fleetwood, (2) he did so with the deliberate intention of taking the victim's life, and (3) this happened in New Mexico on or about the date specified in the criminal information.  UJI 14-201 NMRA; *see* NMSA 1978, § 30-2-1(A)(1) (1994).

{36}    Because Defendant admitted that he killed the victim, we need only to consider

whether there was sufficient evidence for the jury to find he did so with the level of intent necessary to sustain a first-degree murder conviction. The requisite state of mind for first degree murder is a "deliberate" intention to kill. *See* § 30-2-1(A)(1); *see also* UJI 14-201. "The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." UJI 14-201. Though deliberate intent requires a "calculated judgment" to kill, the weighing required for deliberate intent "may be arrived at in a short period of time." *Id.* In determining whether a defendant made a calculated judgment to kill, the jury may infer intent from circumstantial evidence; direct evidence of a defendant's state of mind is not required. *See State v. Duran*, 2006-NMSC-035, ¶ 7, 140 N.M. 94, 140 P.3d 515.

{37} Much of Defendant's argument centers around the version of events he told police—that he shot the victim in self-defense. He claims that the State did not present sufficient evidence to prove that he killed the victim willfully and deliberately because the shooting was a "rash and impulsive act of shooting a man immediately after being shot at." But because the jury is free to reject Defendant's version of the facts, "[c]ontrary evidence supporting acquittal does not provide a basis for reversal." *Id.* ¶ 5 (internal quotation marks and citation omitted). Instead, we consider the

18

evidence that supports the verdict in this case.

{38} Defendant acknowledged that he entered the victim's house in the dead of night—late enough that the victim was asleep. Defendant told Sarah that he shot the sleeping victim point blank in the head. *See Cunningham*, 2000-NMSC-009, ¶ 28 (inferring deliberate intent when the defendant killed an incapacitated and defenseless victim). Defendant admitted to shooting the victim twice; the second shot came after the victim was incapacitated from the first and was "gurgling." *See State v. Flores*, 2010-NMSC-002, ¶¶ 21-22, 147 N.M. 542, 226 P.3d 641 (finding an attempt at "overkill" among the evidence sufficient to uphold a finding of intent). The two shots were from one side of the head to the other, which corroborates Defendant's statement to Sarah that he shot the victim while the victim slept. Further, Defendant attempted to eliminate evidence of the crime by hiding the clothes he wore and the pistol he used after he killed the victim—a conscious effort to mislead police—which indicates an awareness of his own guilt and cuts against his claim that the killing was in self-defense. *See id.* ¶ 23 ("[E]vidence of . . . an attempt to deceive the police may prove consciousness of guilt." (internal quotation marks and citation omitted)). Accordingly, we hold that the jury received sufficient evidence to find that Defendant killed the victim with a deliberate intention to kill.

**{39}** Defendant also argues that the State did not prove that the killing was unlawful. "Every killing of a person by another is presumed to be unlawful, and only when it can be shown to be excusable or justifiable will it be held otherwise." *State v. Noble*, 90 N.M. 360, 364, 563 P.2d 1153, 1157 (1977). Unlawfulness only becomes an element of a homicide when a defense that justifies the homicide is raised. *See State v. Parish*, 118 N.M. 39, 42, 878 P.2d 988, 991 (1994). Consistent with our conclusion that a self-defense jury instruction was not required, Defendant did not present sufficient evidence to rebut the presumptive unlawfulness of this murder and raise a reasonable doubt about whether he acted lawfully. Accordingly, we affirm Defendant's conviction for first-degree murder.

**2.** *Tampering With Evidence*

**{40}** In order to prove that Defendant tampered with evidence, the State had to prove that (1) Defendant hid physical evidence; (2) Defendant did so intending to prevent his apprehension, prosecution, or conviction; and (3) this happened in New Mexico on or about the date specified in the criminal information. UJI 14-2241 NMRA; *see* NMSA 1978, § 30-22-5(A) (2003).

**{41}** Defendant admitted to throwing his clothes and boots into a dumpster and also admitted to burying the pistol used in the killing. Independent evidence—including

20

Sarah's testimony and the eventual discovery by the police of the pistol—corroborated these admissions. And the jury learned that Defendant did these things the day after he killed the victim. Defendant also admitted that he removed the bullet cases from the pistol and threw them away immediately after the shooting. It would not be unreasonable for the jury to infer that Defendant did these things to elude detection or disrupt the police investigation. Accordingly, we hold that the State presented sufficient evidence for a reasoning jury to find beyond a reasonable doubt that Defendant tampered with evidence, and we affirm Defendant's conviction.

## III.    CONCLUSION

{42}    Defendant's confrontation right was not violated. Defendant was not entitled to a self-defense instruction, and his trial counsel was not ineffective for failing to ask for one. Finally, the evidence was sufficient as a matter of law to support Defendant's convictions. We therefore affirm Defendant's judgment, conviction, and sentence.

{43}    **IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

21

_____

**PETRA JIMENEZ MAES, Chief Justice**


_____

**PATRICIO M. SERNA, Justice**


_____

**RICHARD C. BOSSON, Justice**


_____

**EDWARD L. CHÁVEZ, Justice**

22