## CLARKE v. UNITED STATES.

### No. 9914.

Circuit Court of Appeals, Ninth Circuit.

Dec. 30, 1942.

Rehearing Denied Feb. 6, 1943.

---

H. Sylvester Garvin and Anthony Savage, both of Seattle, Wash., for appellant.

J. Charles Dennis, U. S. Atty., and G. D. Hile, Asst. U. S. Atty., both of Seattle, Wash., for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HANEY, Circuit Judge.

Appellant was convicted on each of four counts of an indictment, was sentenced to imprisonment for four years on each count, the sentences to run concurrently, and appeals.

The indictment is based on 18 U.S.C.A. § 338, which provides in part: "Whoever, having devised * * * any scheme * * * to defraud, or for obtaining money or property by means of false or fraudulent * * * representations * * * shall, for the purpose of executing such scheme * * * or attempting so to do * * * cause to be placed, any letter * * * in any post office * * * to be sent or delivered by the post office establishment of the United States * * * or shall knowingly cause to be delivered by mail according to the direction thereon * * * any such letter * * * shall be fined * * *."

The indictment charged that prior to the use of the mails as therein charged, appellant, one Drummey and one Main schemed to procure possession of, and authority to sell, a large number of highly valuable shares of the Coca-Cola Company and the Coca-Cola International Corporation, owned by Jean Hunter, for the pre-tended benefit of the victim and her family, but in truth and in fact, for the purpose of gaining control of the proceeds of the stock and so to be able to convert such proceeds to their own use and benefit, and for the benefit of certain business concerns in which they were interested; and that the conspirators, to induce the victim to deliver the stock to them made certain specific representations to the victim which were false.

It is further charged that for the purpose of executing the scheme, the conspirators caused to be placed in a United States Post Office to be transported by mail, four different letters. The letter upon which the first count was based was a letter addressed to E. A. Pierce & Co., 40 Wall Street, N. Y., and contained stock in Coca-Cola Company and Coca-Cola International Corporation. The letter described in the second count was a letter addressed to the same addressee and contained additional stock in Coca-Cola Company. The letter described in the third count was a letter from Drummey to appellant Clarke. The letter described in the fourth and last count was a letter from Drummey to the victim Hunter.

There was evidence that Drummey and appellant had become acquainted prior to the time they had become acquainted with Mrs. Hunter, and that appellant had known Drummey for some time prior thereto. Mrs. Hunter testified that in the spring of 1939, she purchased some stock in Main Laboratories, Inc., a corporation, from one Brookings and one Leining, paying therefor $100. Thereafter Mrs. Hunter visited the laboratories several times and became acquainted with Main and appellant. She then gave Brookings some of her stock in Coca-Cola International Corporation and Coca-Cola Company with instructions to sell the same and with the proceeds purchase stock in Main Laboratories, Inc. As a result of this transaction, she received about $18,000 for her stock which was used to purchase stock in Main Laboratories, Inc.

Mrs. Hunter was treated by appellant, an osteopath, on April 20 and 28, May 5, 12, 19, 27 and on June 2 and 9, all in 1939. At one of the conversations with appellant prior to May 13, 1939, Mrs. Hunter asked appellant if he thought it would be safe for her to invest some more money in Main Laboratories, Inc. to which appellant replied that he thought it would be perfect-

ly safe, but that he had better plans. Appellant further stated:

"He told me he had better plans; that he had inside information that the future of Coca-Cola was very uncertain and that it would be likely to go on the rocks inside of two years, and he thought it would be safe or better for me to sell out while I could realize something from the Coca-Cola stock and invest in something sure. I said, 'What, for instance? Government bonds?', and he said, 'Oh, good Lord, no. They are no good.'

"He said he would get in touch with a friend of his in Seattle who would know all about it; that this friend had been in business in Seattle for years, was well established, was four-square, and would know, if anyone would, and that he would get in touch with his friend and find out. I cannot recall anything else being said at that time."

Mrs. Hunter testified that she believed appellant implicitly. On May 15, 1939, appellant met with Mrs. Hunter and Main, and one Griswold who had been sent by Drummey. At that time, Mrs. Hunter delivered more of her stock for sale. It was sold by Drummey for about $84,000. About 10 days later appellant took the remainder of her stock to Drummey's office. At that time appellant, Main and Drummey were present with others. Mrs. Hunter testified:

"Dr. Clarke asked Mr. Drummey to tell me what he thought the future of Coca-Cola was; and Mr. Drummey said that in his opinion it was very uncertain, and likely to go on the rocks in a short time; that it might be a good plan to sell while I realized something from it, and to invest in something sure. I said, 'What, for instance?' and he said, 'Well, Government bonds,' and Dr. Clarke said, 'Oh, good Lord, no.'

"Mr. Drummey said that he thought Seattle Loan and Discount stock was a good investment, safe, and that they could make some money for me."

Mrs. Hunter delivered the remainder of her stock to Drummey for sale. It was sold by Drummey for about $41,000.

Prior to the $84,000 sale, appellant and Drummey agreed to split any commission Drummey received. They also went to the office of E. A. Pierce & Co. to find out how Mrs. Hunter's stock was to be sold,

and learned that the stock would be sent to New York City by mail.

The proceeds of about $125,000 received from Mrs. Hunter's stock was disposed of as follows:

Stock in Main Laboratories, Inc.,
about ...................... $25,500
Stock in Seattle Loan & Discount
Company, about ............... 43,000
Loan to Drummey .............. 25,000
Cash to Mrs. Hunter, about....... 16,000
Commission for sale of Mrs. Hunter's stock ................... balance

The stock in Main Laboratories, Inc., was worthless. The stock in the second item may have a small value. The loan to Drummey had little, if any value. The commission charged by Drummey for the sale of Mrs. Hunter's stock was wholly unnecessary because Mrs. Hunter could have taken the stock to E. A. Pierce & Co. and had it sold for the same small commission that the firm charged Drummey. Appellant's share of the commission charged by Drummey amounted to about $11,000. In addition appellant charged Mrs. Hunter $1,000 for the treatments, and borrowed $1,000 from her.

We need not relate the contrary evidence because the jury disbelieved it.

At the conclusion of the evidence, appellant challenged the sufficiency thereof.

The court below instructed the jury that if a scheme to defraud were in operation "any defendant consciously and knowingly cooperating therein is responsible for the mailings although he may not have known of the particular act of mailing at all". The court also instructed the jury that if they were convinced beyond a reasonable doubt that the conspirators did devise or join in a scheme to defraud "and did use or cause the mails to be used in connection therewith" then the conspirators were guilty.

The jury found appellant guilty on all four counts. His sentences were four years' imprisonment on each count, the sentences to run concurrently.

Appellant contends that there is no substantial evidence to show that appellant devised a scheme to defraud or to show that appellant caused the letters to be mailed.

With respect to the scheme we think the evidence is sufficient to support the verdict. It is rare when direct proof

of the devising of the scheme may be given. In most cases it must be inferred. In the instant case the conversations between appellant and Drummey, their agreement to divide commissions, and the advice given by each regarding the future value of Mrs. Hunter's stock point strongly to the scheme. There would have been no reason to agree to a division of the spoils, if they had not reached an agreement to obtain the spoils.

We think also that the evidence is sufficient regarding the causing of the letters to be mailed. To realize on the stock it was apparent that it would have to be sold. To sell the stock it was required that such stock be sent to New York. Appellant knew it would be sent by mail. Being a party to the scheme, appellant acquiesced, if not more, in the mailing of the stock. E. A. Pierce & Co. became his agent for that purpose. United States v. Kenofskey, 243 U.S. 440, 443, 37 S.Ct. 438, 61 L.Ed. 836. It is obvious that the use of the mails was for the purpose of getting control of all or part of the proceeds of the stock. It was one link in the accomplishment of the scheme.

■ Appellant's argument that the instructions, above referred to, are erroneous is as follows: "* * * It manifestly is not sufficient to sustain a conviction that the jury find that a letter was mailed in connection with a scheme to defraud. The use of the mails as specifically set forth in the statute must be for the furtherance and in execution of the scheme to defraud. In other words, the use of the mails must be purposeful and intentional, resulting in culpability."

The statute itself requires use of the mails only "for the purpose of executing such scheme * * ' or attempting so to do". It was unnecessary for appellant himself to mail the letter. If he brought about the mailing, that would be sufficient. United States v. Kenofskey, supra, 243 U. S. at page 443, 37 S.Ct. 438, 61 L.Ed. 836.

■ The instructions challenged, standing alone are incorrect because they do not require that the mails be used "for the purpose of executing" the scheme "or attempting so to do". There is no crime unless the mails were used for the purpose mentioned. As said in Lonergan v. United States, 9 Cir., 88 F.2d 591, 594: "The gist of the offense was not the making of representations or the doing of other acts which the scheme contemplated, but the use of the mails for the purpose of executing the scheme."

In Village of Evanston v. Gunn, 99 U.S. 660, 668, 25 L.Ed. 306, it was said: "* * * Sentences may, it is true, be extracted from the charge, which if read apart from their connection, need qualification. But the qualifications were given in the context, and the jury could not possibly have been mislead * * *."

In the instant case the court charged the jury as follows:

"* * * The nature of the matter sent by mail is immaterial. It is the purpose inspiring the sending of the matter through the mail that brings the one causing the matter to be mailed within the Mail Fraud Law.

"* * * Nor is it necessary that anyone should have been caused to part with their money by reason of any communication through the United States mail from the defendants, or defendant; but the mail matter must have some relation to and be a step in the attempted execution of the scheme and must be mailed or cause to be mailed with the intent to aid its execution."

■ When the challenged instructions are read together with the last quoted ones, we believe they did not mislead the jury, although they are not a model of clarity with respect to the point urged. We think, after an examination of the entire record, the substantial rights of appellant were not affected by the claimed errors, and, therefore, the judgment must be affirmed. 28 U.S.C.A. § 391.

Affirmed.